15-2708 from the Northern District of Iowa, Kathy Sellars et al. v. CRST Expedited. Counsel, we're ready to begin. Thank you, Your Honor. May I please report? Defendant asks this court to condone a policy of imposing a materially adverse action as its automatic response to complaints of sexual harassment. This is the definition of retaliation. The district court in this case found that there was sufficient evidence that the defendant maintained a policy of removing women truck drivers from their trucks as its automatic response to their complaints, leaving them unpaid upon removal. And it found that a reasonable jury can conclude that that is materially adverse. Nothing in Title VII's anti-retaliation provision, nor in the law of any federal circuit, creates a requirement to additionally prove some kind of deeper retaliatory intent or animus where the policy itself establishes causation. Moreover, even if this weren't a case where the policy is retaliatory in itself, plaintiffs did present evidence also of defendants on management acknowledging its policy was a punishment for women who complained. And defendant never advanced any legitimate and non-discriminatory reason for leaving women unpaid when it removed them from their trucks. For these reasons, plaintiff's retaliation claim should have gone to a jury. Defendant is also asking this court to accept that there is no point at which widespread sexual harassment that occurs over and over and over again, even to the same woman, to the same plaintiff, can put defendant on notice that its policies are failing to protect women from harassment at work unless it is the same male employee doing the harassment repeatedly. That would be sufficient, but at some point it can't be a necessary condition to find that an employer is on notice and has a duty to take further preventive measures. We know Title VII creates a duty to try to prevent harassment, not just to try to remedy it after the fact. And CRST has reached that point of incurring a duty to take further action between its long history of sexual harassment complaints, including numerous claims upheld at summary judgment in prior litigations before this one. Counsel, how do we how do we know when a company such as CRST has reached what you call that point? Well, Your Honor, I think that ultimately that is the question that the jury has to decide. It is a fact question at what point you have reached that line, just the same as it would be in an individual case where you are operating under a negligence standard for co-worker harassment. Are there any is there what case law within our circuit permits us to look at this hostile work environment case like that? I would say, Your Honor, that there is nothing speaking directly to the question of whether harassment that occurs by different individuals can kind of cumulatively put the employer on notice in that way. But there's nothing excluding that either. It's simply not something I've seen addressed. And I think that if you look at basic negligence case law, this is an almost inevitable conclusion to come to. There's sort of if I can give Your Honor a hypothetical, for instance, you could imagine an area where you have employees in a workplace where they're having a problem with graffiti, say, there's racially offensive graffiti that appears on the wall. So the employees come in in the morning, they see the graffiti, and one of the employees reports it, and right away the employer comes and they paint over it. Right? The employer doesn't know who did it in this scenario, of course. The next day, the same thing happens. The graffiti is back. The employees see it. They complain. The employer paints over it. At some point after seven days of this, a month of this, six months of this, a year of this occurring every day, at some point under basic negligence law, it's fair to say the current remedial measure is not working. The harm is continuing, and the employer has a duty to figure out what more it can do. And I don't know that there's going to be something that says, well, the magic line is seven days or one month or six months, but rather that that's a quintessential jury question. That's exactly what a jury is there to determine. When is it reasonable to say the employer needed to look into doing more than just that? Just quickly, you're talking about the remedial step and not necessarily the constructive knowledge, because they seem, obviously they're different, but in a situation with CRST where you don't have the same people coming into one business location, so you kind of know your cast of characters who could be making the graffiti, the workplace is spread out all across the country, two by two by two by two. So when you're talking about that sort of response that CRST needs to make, are you are you landing that in sort of more of the constructive knowledge or in the remedial action that should have been taken? Well, if I understand your question correctly, I think they are kind of related. It's a little hard to extricate these things from each other. I think what I'm trying to say is that the employer at some point is on notice that its policies are not working. And that should not only be contingent on the same individual doing the harm, because you can, you know, if you look at the graffiti example, for example, it could be different people making this graffiti, say it's not the same individual, say each day there are a stream of new employees coming in and for some reason, many of them want to engage in the same behavior. The employer has options beyond just painting over it for what it could do to stop that behavior from occurring in the future, even if it's different people who are doing it, and it can't exactly anticipate which one. For example, the employer could walk off access to that particular location overnight if it seems that it's occurring overnight. The employer could put up a security camera, say, so that it can always be certain of who is doing it if the behavior recurs, that sort of thing. So I think in the same way, the fact that there is constructive notice may inform what type of remedial measures would be appropriate in this case as well. The fact that it is different people doing the harassing might mean that certain things that would be good remedial measures where there's a single harasser aren't going to work, and you have to look to other types of remedies. Well, the problem I have with this is the cases, you're right, that we don't necessarily have one addressing widespread harassment, but we do have cases that suggest that you need to have some evidence that it's the same harasser. I mean, we do have cases of that nature. And here, we don't even have evidence that any of the individual drivers who harassed these women had harassed anyone else. And isn't that a problem under this set of cases that we have, whether you agree with them or not? I think that this is an extremely unusual situation because of the nature of the workplace, but I don't think that means there are certain types of workplaces where Title VII simply no longer applies. But suppose that each one of these employees were fired that did harassment. First time, zero tolerance each time it happens. Yet, you have the same facts you have here. You have women who have been harassed five, six, seven times. Would you be making the same argument here even if these harassers were fired? I think at some point, yes, to be honest, Your Honor. At some point, that remains a problem. And if I can even change my hypothetical a little bit, say you had a workplace where there was an employer standing next to a woman, a female employee. A new male employee comes in. He grabs her on the rear. The employer says, you're fired, sends the guy out immediately. The next new employee comes in. He does the same thing. Employer says, you're fired. Again, at some point, you know, maybe the first two times, five times, 10 times, 20 times, perhaps this is still reasonable, right, under a negligence standard. But after 50 times, 100 times, you start to say, well, some further action is clearly necessary to stop this from recurring. That said, I think in the real world, obviously, imposing actual disciplinary measures in a consistent way can deter this type of behavior from occurring in the future. And that is one of the things that the employer could certainly look at to enhance its policies in a way that would prevent this kind of harassment from continuing. Well, to get back to Judge Kelly's point, is this really about the effectiveness of the remedy? So there's two remedies, right? The remedy I just gave you is a hypothetical firing each employee. And then what we have here, which is separating the two employees and perhaps making the harassers male-only employees. So you don't pair them with female employees. Is that really about the remedy, the adequacy of the remedy or the effectiveness of the remedy then? That's the problem here? I'm not trying to understand your question, Your Honor, so I apologize if this is non-responsive. I would say it is a remedy that has been tried, but it is not a remedy that is stopping the harassment, as evidenced by the fact that this record of continuing problems has gone on for over a decade and throughout the class of this case. So there are other types of remedies that could be used that would hopefully do more to stop that from occurring in the future. But simply relying on the remedy that at one time was decided upon is not enough. You can't just forgo responsibility for continuing to consider that under the negligence standard. I want to ask you one question about the point you initially made, which was about retaliation. Really, the company, at least in terms of the interest they're asserting, which is separating the employees immediately, the harasser and the harassee, they really have two choices. They can either remove the harassee from the women from the truck, or they can remove the harasser. And they say, you know, this presents problems because some of these folks own the truck, there's some licensing issues and stuff like that. And so I'm just trying to figure out how that can be retaliation. Because, I mean, the fact of the matter is their first priority is separating them. Yeah, Your Honor, the retaliatory act is not merely choosing to remove the harassee. It is removing the harassee and leaving her unpaid. It is the unpaid nature of that act that makes it retaliatory, because it is an act that deters women from making complaints in the future. If they were fully compensating these women to the same standard they would have been earning if they had remained on the truck, we would not be here. It would not be a problem. So post-layover or layover policy, so when they actually paid these women, would you make a different argument on retaliation? Is that period then not retaliatory in the way CRST conducts itself? In this specific circumstance, it did remain retaliatory for reasons I'll let the EOC address in further detail for you, and he'll be able to answer that question. But CRST intentionally did not tell women about the existence of this layover pay, leaving them reasonably under the impression they were going to still lose pay if they complained, even in the post-layover pay period. And I want to stop, Your Honor, so that I can make sure to reserve a little time for rebuttal. You may. Counsel, we're ready for your argument. Thank you, Judge Kelly. May it please the court. I'm Philip Kovnick, Counsel. I think we're having some video and audio trouble. Is everyone else having difficulty hearing Mr. Kovnick? Yes.  Okay. Mr. Kovnick? Let's stop. Yeah, you have stopped the clock, which is good, so we'll get this fixed before we get going again. Mr. Kovnick, if you can hear me, if you want to just go ahead and disconnect from the meeting and come back in using that same link. Okay. Well, we have you back, so we welcome your argument at this time. Thank you, Judge Kelly. May it please the court. My name is Philip Kovnick, Counsel with the EEOC. In the commission's view, the district court here made three critical errors, two of which relate to the retaliation claims, and one is related to the constructive discharge claims. With respect to the retaliation claims, the court did not apply the correct causation standard, and it did not correctly assess whether the plaintiffs whose claims arose under the July 2015 policy suffered materially adverse actions under the Supreme Court's decision in Burlington Northern. Now, with respect to causation, this is really the unusual case in which causation is readily established through the employer's policies, which on their face differentiate among workers based on whether they have engaged in protective activity. And because CRST had policies that identified individuals on the basis of whether they have complained of discrimination or harassment and subjected them to differential treatment, there's really no dispute over whether there's a but-for causal link between the protected activity and the materially adverse action or the allegedly adverse action. Now, the district court rejected the class retaliation claims here on the theory that there was insufficient evidence that CRST carried out its policies with an intent to harm or an intent to punish, but that is not required. What is required is that in addition to causation, the plaintiffs have to show that the complaint of removals were materially adverse, and so that requires us to just plug in the standard from Burlington Northern, which is whether an action is likely to dissuade a reasonable person from making or supporting a discrimination complaint. And as to the July 2015 thereafter plaintiffs, the district court did not apply that Burlington Northern standard. It instead insisted upon showing that those individuals lost significant or substantial amounts of money as a result of the removals, and that is just not the correct standard. There's never been a requirement that you show significant monetary losses to show an adverse action in the context of a retaliation claim. You just have to show something that would dissuade a reasonable person from engaging in protected activity. And a more fundamental error, and this goes to the conversation between Judge Strauss and Ms. Schutz, that even assuming all of the individuals in the July 2015 period recouped all of the money that they would have lost, because they were never on notice that the policy had changed, they faced a realistic prospect of harm, which also is enough for a jury to determine could reasonably dissuade an individual from engaging in protected activity. So those are the critical errors that the district court made in the retaliation context. I want to ask you about the first one, which is I just want to see where this fits in. So we have direct evidence is one way to prove the retaliation, and we have the McDonnell Douglas burden shifting. And I think if I'm understanding you correctly, you're proposing a third way, which is that the policy itself retaliation, per se, is I think what what some courts have called it is is a third category by which you can prove retaliation. My first question is, is that accurate? And second, have we ever adopted it? Your Honor, I don't know that I would characterize it as a third way. I think it is a direct evidence approach. It's the direct evidence is that the policy directly shows the causal connection between the protected trade or protected activity and the allegedly adverse action. So I think it is a direct evidence analysis. As to your question as to whether this part has addressed it, the Jankowitz decision, which is an age discrimination case, has a very analogous scenario, which is an employer had a policy that said individuals above the age of 65 were entitled to certain benefits and individuals below the age of 65 were not. And the court said that on that policy, you could infer retaliatory, I'm sorry, discriminatory intent because the policy itself shows that intent to distinguish on the basis of our protected characteristic. The Carney versus Martin Luther Holmes case, which we also cited in our brief is a pregnancy discrimination case. It also applies this framework that if there's a policy that differentiates in and of itself, there's no requirement to apply any other inferences or any other questions about what was in the mind of the employer, because the employer has written out in black and white what it why it is doing what it is doing. So here, there's really no question that the protected activity was directly causally linked to the removal. The question is really whether the removals are materially adverse under Burlington Northern to satisfy the retaliation claim. And there, you just plug in the retaliation standard, which is whether it would dissuade, likely dissuade a reasonable person from engaging in protected activity and monetary losses are plainly sufficient to satisfy that. And even the realistic threat of monetary losses are sufficient to satisfy that. So I see I'm out of time, but. Go ahead. I was just going to ask, you know, in this do the legitimate not in this in this theory, you have a legitimate nondiscriminatory reasons of the employer play any roles or is McDonnell Douglas off the table. McDonnell Douglas is besides the point. So you're I guess your honor is correct. It's by saying off the table. I think an employer can have multiple reasons for taking an adverse action, some of which are legitimate, some of which are because of a protected tree. Because here, there's no question that at least one of the reasons was because of the protected tree. It's irrelevant that CRC may have had sincere legitimate reasons, you know, e.g. protecting women or ownership considerations. What have you. Those don't cancel out the fact that at least one but for cause was the protected activity. And what about the finisher? If you had another question? Well, I was actually going to address a question. Judge Ross asked me to shoot, so I don't necessarily need. Well, let let me follow up on this line. Just with a quick question. What about a driver? Let's say a woman in this context to complaints of harassment, but it's not on the truck. It's at one of the terminals. So this person is still, I suppose, in theory, connected to her work. Do you have the same result? In other words, the stopping of pay? They're not removed from a truck, but they have complained of harassment. How do you handle those two different types of harassment claims from two different locations within this business model? Well, I mean, then presumably the removal policies that remove complainants from trucks would not apply because they're just in the terminal or in a more traditional workplace. So the policy is only for driver with for women or or men for people in the truck. So what you're you have sliced the policy thinly to not include harassment generally, just harassment in a truck. Well, there are two policies at issue. There's the July 2015 policy, which was written out, and that refers to removal from trucks as the remedy for that scenario. So I think that policy on its own terms just applies to that scenario. The pre-July 2015 policy is a little more amorphous. I mean, it says that the victim of harassment will be separated from the harasser. So that could come up in the context of a truck or could come up in a different context. But ultimately, as to each individual, you just have to determine whether they suffered something that was materially adverse under Burlington Northern. Now being separated in and of itself, especially in a terminal, is probably not materially adverse because it doesn't actually have much in the way of ramifications, economic or otherwise. Removal from a truck, especially when it's at substandard wages or no wages whatsoever, is plainly materially adverse. So that is the focus of our argument. Any more questions for Mr. Knapp? All right, well, thank you for your argument. And we will we'll move on to Mr. Matthias. Thank you, Your Honor. Thank you. Yes, I may please the court. I'm John Matthias and I'm here for CRST. CRST has a comprehensive policy strictly forbidding sexual harassment and retaliation, a policy which this court has previously upheld in an earlier case involving EEOC as the type of prompt and effective remedial action that our precedents prescribe. Now, an issue here is that part of this policy, which requires that a driver reporting sexual harassment will be promptly removed from the harassing situation, which in most but not all instances involves the truck in which she is driving. Rather than being a remedial measure, a legitimate remedial measure, our opponents contend that this constitutes an adverse employment action because for the time being they aren't being paid the same per mile pay that they would otherwise earn if they had continued driving without an interruption. And this, they say, is the real reason why CRST removes complaining drivers from their trucks, that is to retaliate against them for reporting the sexual harassment they're required to report by company policy. But they take it a step further and they say that CRST's motives don't really matter anyway because this company policy constitutes illegal retaliation per se under Title VII. But CRST's motives do matter as the Supreme Court has made very clear in its opinion in the Nassar case in 2013 where it concluded that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action. Now this court has consistently followed Nassar. It's done so in Houghton v. Maynard in 2016, in Donovan v. Oakley-Grain in 2017, and again in Baradwaj v. Mid-Dakota Clinic in 2020, Judge Strauss's opinion. So the question then arises, the initial question arises, as to would a reporting driver's removal from the harassing situation have occurred anyway in the absence of a desire to retaliate by CRST? And the answer here is clearly yes, it would have. And the reason it would have is because prompt removal from the harassing situation, whatever that might be and wherever it might occur, is the first, the very first remedial step that's prescribed in CRST's remedial policy, which every driver knows about and acknowledges on the day that they first started working. So it's the first remedial step for a reason, a very good reason. There are other reasons, but the very first good reason is safety, safety first. It assures the safety of the driver who is complaining of sexual harassment in anticipated circumstances, which could be anything. We don't know in advance what those circumstances are going to be. This policy assures that safety, removal from those circumstances. It makes sense to have a consistent policy rather than making one up on the fly, by the way, so that everybody knows what the drill is once it happens and there is no confusion as to what's required. Why, though, always removing the harassed individual rather than the harasser? What's CRST's reasoning for that? It makes sense to have a consistent policy rather than making one up on the fly, by the way, so that everybody knows what the drill is once it happens and there is no confusion as to what's CRST's reasoning for that? Has that ever happened? It doesn't really have to do with gender, either. It's the complaining driver who's removed from the truck, and it's done consistently, and we say for very good reasons. Now, you mentioned safety, though. The other side makes an issue of this and says, well, it presumes, even apart from gender, that the person who's harassed can't safely operate a vehicle. Is that a basis for it? I mean, you're citing safety. I'm trying to figure out if there's any merit to what they're arguing. Well, it doesn't presume. We're not asserting that as a reason that the driver cannot safely operate. Maybe yes, maybe no, but it's the uncertainty of the situation which drives the decision. Well, wouldn't the reverse be a much more effective policy? Put the offending driver out in the middle of Tucumcari, New Mexico, and let the victim take the truck back. It's not a neutral. It's not a neutral. It's penalizing the complainant. Keep in mind that these are, in the large part, for the most part, these are training situations. So what you're talking about, training situations. So none of your experienced drivers had any problems? Well, experienced drivers do have problems from time to time. There's a smaller percentage of them, but the larger percentage are trainees. And so, again, it makes sense to have that consistent policy so that there's no ifs, ands, or buts about it. Wouldn't the answer be to immediately discharge the harasser? Well, no, the answer would not be that. The answer would be to conduct an investigation, a fair investigation, into what exactly happened, and that's a second of the reasons that are... And in your case, all of the offending drivers were fired. No, they're not. Well, if they're found to have been offended, if they are found to have offended, then... So how many of them were, in this case, discharged? In this case, there are three complainants, and so none of them were discharged in this case. But the remedy for sexual harassment, which is found to have occurred, can include termination, suspension and or termination. That is a remedy. It's prescribing the policy, again. CRST... We don't care what the policy says, it's what the policy does. How effective is your policy? Well, we contend, and we've been through this court several times now, we contend that our policy is, and as this court has upheld, it is both the prompt and effective remedial measures that your precedents prescribe. So we stand by our policy. We stand by the enforcement of our policy. We do it robustly. We do it continuously. We are in the trucking industry. These are cabs, truck cabs that are two-person, two-driver cabs that are away, far away from the... You don't have to tell us the facts of life, Mr. Whatever-Your-Name-Is. We know how this works. Okay. And the... I have a follow-up question on what you're saying, it's a remedial measure. And I understand there's two people involved. You have a complainant and the person that they are complaining about. But if consistently there is no one discharged unless they admit to what they are accused of, how is that remedial? How does just putting everyone who doesn't admit, and maybe some agree didn't do it, but how is just putting them on a mail-only, a remedial tactic in the sense of looking forward and how a company like this wants to run its business and looking forward to preventing this kind of conduct in the future? I'm struggling with how mail-only is any kind of a disciplinary action. Well, again, now we're moving to the discipline of the driver who is accused of sexual harassment. This is a different... Well, in the context of you were talking about it in the sense of remediation, and I'm just kind of curious of how you see that fitting into the remedial action. All right. So once the driver has been removed from the harassment situation, there is a prompt and immediate investigation which is undertaken. This takes a little time. You have to interview both the complainant and the person who's accused. You then take a look and there's a department that does this. And Your Honor, it is not correct that nobody is ever terminated. They are terminated. Nobody's ever terminated unless they admit it. If there is sufficient evidence that they have done this, if they have... And that then the alleged and now confirmed harasser has been fired. How often roughly does that happen? It has happened. In fairness, the record isn't complete on this, but in fairness, it doesn't happen very often. But that's the nature of the circumstance. That's the nature of the circumstance in which CRST finds itself operating its company. You have to be fair to both people. And the Eighth Circuit's very clear on this. You can't just accept one word and not the other. There are two people who have their futures at stake here. And so we don't have the power. See, this is another case. We've been through this before. And it's all been... And Judge Reed saw it and the Eighth Circuit saw it before we've gone through these issues before. We've had to defend ourselves and we have. We have successfully defended ourselves because when you're investigating claims like this, we don't have the subpoena power. We don't have the ability to put people under oath. We don't have the ability to fine people. We don't have any of those abilities to compel testimony. So we do what we can. And we do it very aggressively. And we think we do it pretty well. And so that the circumstances under which women who drive for us, the very valued employees that we have, the women that we train, and we don't want to lose anybody. We want everybody to work happily in our environment. The last thing that CRSD wants to do is to allow a circumstances where any of its employees are harassed for any reason, completely contrary to our business model. We want none of that ever. And it shows. And I get back to what we have to show here in this case to show retaliation. You have to show a retaliatory onus. The Supreme Court is very clear. Title VII is a remedial statute. You have to have some misconduct there, some bad conduct to remedy. And we don't have any of that here. Everything that CRSD does is designed to prevent harassment rather than the opposite under circumstances which require men and women to drive together. And the reason for that, as your Honor I'm sure knows, is that Title VII requires that. There's no option here. You can't have men drive with men and women drive with women, nor would we. But that itself is illegal under Title VII. Counsel, I want to ask you about, you mentioned this, our earlier opinion in which we said that CRSD has provided an efficient remedy with the policy that you have today. But I wonder, you struggle with that because you wonder how binding that particular finding is on us. And what I mean by that is we have seven or eight years now in between these cases, and at least according to opposing counsel, we have rampant sexual harassment. So, I mean, I understand those are allegations at this point, but are we really bound by that if circumstances have changed? No, you're not bound by it, Your Honor. I think we stated that in our brief, and I think Judge Strand also found that. Of course, I mean, things can happen, right? I mean, as time marches on. It would be improbable, one would think, that having been through all of this, that we all of a sudden let our guard down and not keep doing the same thing. That seems quite improbable. But no, you're not bound by it. I think Judge Strand found that it was instructive, and I think that's what we would say here, too, that it's instructive, it's helpful. This has been tested before. Other cases, other parties can cite this as precedent and show the policy that we had that's in the record step by step by step by step, and they could say, well, that was held to be precedent before, so it should be good enough here. But no, you're not bound by it. I want to also ask you about the EEOC's argument, which is, their argument is that on its face, this is a discriminatory policy, and we don't go through McDonnell Douglas. This is a form of direct evidence. I struggle with what framework this is in, and I just want to give you a chance to respond to that specific point. I would respond to that, and one of the things I think is notable about the briefs, I've read them a bunch of times now, and the Nassar case isn't mentioned by the EEOC. It's striking. I mean, how can you not mention Nassar in this case? Nassar is definitive. It's very clear that Title VII retaliation plans require proof that the desire to retaliate is the but-for cause of the challenged action. And again, I get to you, the Eighth Circuit, you've been very consistent in citing Nassar, because retaliatory animus needs to be proven. You can't do away with McDonnell Douglas. Judge Strand did, and he was very careful as he went through the step-by-step-by-step analysis. We didn't agree with all of it, mind you, but he came out at the end saying there's no proof that any of these legitimate reasons advanced by CRST are pre-met. They're all legitimate. They seem legitimate on their face. There's no indication in the second step of McDonnell Douglas. They have satisfied their burden of showing that they have legitimate reasons, but the plaintiffs have not satisfied their burden of showing that they're pre-taxed. For that reason, Nassar, Donathan, Bernadouache, Hutton, for that reason, they have failed. And we are not guilty of a Title VII violation for retaliation. So I'd say, you know, you have to overrule. In the Supreme Court, I think they mentioned Bostock, and they say that Bostock did not overrule Nassar. Bostock cited Nassar in the first several paragraphs. I think Justice Gorsuch cited it just for what constitutes but for a causation. But, again, you get to the test here, and that would simply be, you know, it would, removal from the truck, would the pay. And, you know, Judge Kelly asked a question earlier about the employee who complains about sexual harassment in the terminal. And there are complaints of sexual harassment in the terminal. What happens there? Well, prompt removal from the harassing situation, investigation, etc. All of the steps are carried forward there. But there is no linkage there, is there, to a retaliatory pay policy. So the policy of pay, in and of itself, there's two policies here. One of them is, what do you do when you get a complaint of sexual harassment? The other is, what's your pay policy? The pay policy on its face is facially neutral. It applies to everybody the same way. You can earn more money being removed from a truck than you might otherwise earn if you had stayed with the truck. So there are no adverse consequences of being removed from the truck? Well, we say no. We say that's not an adverse consequence. And Judge Strand analyzed it two ways. But we have said that, and we stand by it, is that once removal from the truck does not automatically mean that you earn less pay. There's no direct link there. You can earn more by being removed from the truck. And one of our three plaintiffs, Ms. Fortune, actually began driving the very same day she was removed from the truck. So there's no direct linkage. And I'll give you an example. If you were on a 14-day trip, and on day five of that trip you complained of sexual harassment and you were removed, well, at the end of the 14th day, you were going to have a gap. You were going to have to wait around, do all those things that you would do at the end of that trip you would have been on. Well, if you get off the truck after the fifth day and your next ride goes for 21 days, you actually make 26 days worth of pay before you get to that inevitable gap that you're going to have. So that's not the way drivers think about getting paid. They don't think about I got paid this minute or I got paid this day. They think about what do they have at the end of the month in their paycheck. And that's what matters. And there's been no evidence. This is why we say there's no evidence either way, before or after July 1st of 2015, that indicates that drivers are paid less. There's certainly no evidence that there's a retaliatory onus behind our pay policy. It's the same pay policy that everybody in the industry has. Not just CRST. We haven't made this up. Everybody in the trucking industry, the drivers are the same. Just as a matter of interest, the CRST has the two driver system. Is that the norm in the trucking industry right now? It depends on what part of the trucking industry you're in. In the long haul industry, you can have two drivers, but usually team drivers like CRST, that's actually our niche. There's other companies who do it, but we do it long haul, better, faster, smarter with two. We have a team driving system. So no, I wouldn't say it's the industry standard, because there are many other shorter hauls or different models that only involve one truck driver. But ours, this particular part of CRST, does long haul team driving on an expedited basis, coast to coast or point to point, faster, better than others. That's why we need two drivers. One drives, the other sleeps. And that's the job. Well, if there are no other questions, we thank you for your argument, Mr. Mathias. Thank you. It's a pleasure being here. And Ms. Schutz has, I believe, some rebuttal. Yes, Your Honor. I want to hit just three things extremely quickly from what counsel said. First off, the facts concerning depriving women of pay when they are taken off the truck were never presented to the Eighth Circuit. That's not something the Eighth Circuit ruled on in the EEOC versus CRST litigation that counsel was referring to. So there was no ruling on it. This has not been given some kind of stamp of approval. And of course, as the court pointed out, there's no such thing as a final stamp of approval. The record here is a different record from the record in that case. I also think it's important to note that to the extent those facts were presented in that other litigation at all, it came up once before Judge Reed, who actually ruled with regard to some of the individual cases that survived summary judgment, that there was liability because the supposed remedial measures that the defendant had used, including taking them off the truck and stopping paying them, left them worse off. So to the extent it was ever addressed, it was actually flagged as an issue. That's docket number 225 in the EEOC versus CRST litigation, if counsel or Your Honor is curious. Separately, I wanted to address Nassar. Nassar did not create some kind of new standard of retaliatory animus that applies to all cases. It stands for the proposition that the protected opposition in Title VII has to be the but-for cause of the adverse action. But in that particular case, the plaintiff was claiming that the termination or the adverse action was a result of animus that the employer had towards them. So in that case, it made sense to talk about it in terms of animus, and that's the language that counsel is referring to. But that does not change the Title VII standard. It does not speak to the case law in cases like this one, where the policy itself says in black and white, one is the cause of the other. It's a very unusual circumstance to have a case where there's a policy like that, of course, because mostly employers don't write that kind of thing down. So it's not surprising that it doesn't come up very much, but Nassar is certainly not speaking to this situation at all. I also just wanted to note with regard to something counsel said about making up a policy on the fly. CSU's policy with respect to safety complaints is to make it up on the fly in the sense that if someone calls in with a safety complaint, their own HR layover pay document, which is in our appendix—it's number 133 in the appellant's appendix, if you want to take a look—says that in those safety complaints, they determine what to do. The supervisor just determines who to take off or what to do, as opposed to in cases that are concerning discrimination complaints, when it is always the woman who is complaining she was victimized who's taken off the truck. Thank you to all counsel for your arguments here today, and we will take the matter under advisement. We appreciate your agreeing to appear by video. Thank you, Your Honor. Thank you, Your Honor. Thank you.